

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00378-CR

Bobby **MARTINEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR13098
Honorable Velia J. Meza, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:        Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: March 1, 2023

AFFIRMED

A jury convicted Bobby Martinez of stalking. After Martinez plead true to enhancement based on two prior convictions, the trial court sentenced Martinez to 25 years confinement. On appeal, Martinez asserts the evidence is legally insufficient to sustain the verdict. We affirm.

## BACKGROUND

Martinez was married to Sabrina Palafos. Palafos worked with complainant Deborah Ramirez at a Sonic restaurant in San Antonio, Texas. At that time, Ramirez was in a romantic relationship with Jermaine Garcia. Ramirez and Garcia lived together with their five children.

Martinez (1) knew Ramirez and Garcia and (2) attended their child's sweet sixteen and quinceañera. Sometime in May, June, or July 2019, Palafos broke up with Martinez. Shortly thereafter, Martinez began accusing Ramirez, Garcia, and A.J. Guzman (the owner of the Sonic location) of having an affair with Palafos.

According to Ramirez, on July 9, 2019, Martinez "was trying to get in the [Sonic] store to see if [Palafos] was there. He drove around the lot. He stopped on the drive-thru lane, got off and was trying to open the door, but we had already locked it." Ramirez testified she "was scared of him . . . Because he has threatened me so many times. He said he would shoot me, he would kill me." Martinez showed up again later in the day and, according to Ramirez, "tried to get into the store again and that time we didn't let him in, so he started throwing stuff at my car. He was throwing water bottles, trash, just stuff that was in his car."

On that day, Martinez also repeatedly called Sonic, as reflected on caller ID. Ramirez answered his first call, and Martinez hung up. In response to Martinez's actions, Ramirez called the police. Garcia also went to Sonic because Ramirez was scared to be at work by herself; he testified that on that day Martinez threatened to shoot him twice and, after the second threat, threw a water bottle at him.

Although Martinez had left Sonic by the time police arrived, Officer Melissa Colunga spoke with Martinez after he again called the Sonic. According to Colunga, Martinez "kept going on about his wife cheating on him and were threatening him by keeping him away from the store, and he had the right to be there because that's his wife, and he can go up there whenever he wanted. He just kept going on and on about that. And he mentioned something about her having a relationship with a couple of co-workers. It was a male and a female." Martinez repeatedly talked

over Colunga during the call. After explaining criminal trespass to Martinez, Colunga issued a criminal trespass warning to Martinez over the phone.

Garcia testified that on July 10, 2019, Martinez drove by his home "in the dark with the lights off . . . And once he got past my house, like closer to the corner of the street . . . he took a left and he smashed on the gas. He took off quick, and then the lights came on." Notably, Ramirez's home is located on a street with dead ends on both sides. Ramirez testified that on July 10, Martinez drove by her home twice and the "second time he passed it looked like he was pointing something at me . . . It looked like he had something over his hand and he was pointing something at me." Ramirez could not identify the object in Martinez's hand but perceived it as a threat.

On July 21, 2019, Martinez ignored Colunga's criminal trespass warning and again went to the Sonic. This time, Martinez entered the Sonic. Security footage showed Martinez inside the Sonic pointing at Ramirez. Ramirez testified Martinez said she "better not be effing lying to him that she was there—that Sabrina was there." After Martinez and Palafos broke up, Ramirez would answer calls Martinez placed to Sonic and tell him that Palafos was not there even when she was there. Later that night, Martinez drove by Ramirez's home and "just drives by, cussing me out and speeds off." Officer Art Ramirez (no relation to the complainant) responded to a call the night of July 21, 2019, and testified Ramirez told him that Martinez "had shown up to her house, drove up there, yelled obscenities and threatened to kill her . . . [and later] did it another time, where he threatened to shoot her . . ."

On another occasion, Martinez entered Sonic and, according to Ramirez, "he started flipping the red [food] trays everywhere. He would just walk up to me or to Sabrina [Palafos] and started yelling, cussing us out, just throwing stuff around. He would throw a coat hanger around . . . He was saying we were going to get what we deserved." Ramirez estimated that during this

short period, Martinez went to the Sonic around thirty times and drove by her home twenty to twenty-five times; she further testified:

> There was times where he would drive by, go real slow, look at me, cuss me out. Tell me F you B, I'm going to kill you, I'm going to shoot you. There was times when he just drove by. If we weren't sitting outside, he would make sure that we knew he was passing by. He had really loud music on.
>
> One of the times he drove by and stopped right next to my house and got off, I don't know what he did, and then got back in his car. It was multiple times when he did the same thing.
>
> Q. Okay. Would he say anything when he drove by?
>
> A. Yeah, it was different stuff all the time. He was going to shoot me. He was going to kill me. He was going to have somebody beat me up. His sister, he was going to have his sister come find me.

Martinez also sent at least nineteen complaint emails to Sonic's corporate office. In a July 12, 2019 email admitted into evidence, Martinez wrote:

> Aj Guzman um I nvr realy got to meet him but the story my wife presented to me waz he he liked yunger females n that his father was some type tycoon n da company one day he would be manage as well Mr Aj lookd mad as my wife inform2ed me that .the reason Megan another employee had left sonic.was because he was hitn on her. I told my wife if he messes wth u let me kno.me n ms debras husband spoke n he told me at one point he saw him the same way but that he could b wrg
>
> And that wasone reason that mr Aj had to leave a store in the valley now Ms Ramirez Debra has her daughter werkn therr n my wife has hers there aswel as her bestfrd now im Not sure if that's ok but I could see wer That might set sum type of favortisum or confusion. The way i found out about this affair I snoopd n found m raj I blive askn for my address but usen a dummy numbyer
>
> I saw tons n tons of it PROOF
>
> So Ms SABINA & N IM GUESN MY AJ hakd my acc started erasn all my pic all the pic i was going to presnt to u . I do still hav lots of proof n only it in 3 diff phones due to the hacking,erasn,redirecting my phone calls weni would call down there i kno this sounds. Crazy but I hav all th pictures to prove evrythg im teln u I would like for

all 3cemployes to be fired my wife and Mr Aj. Fr consistently threatn me with harassment charges after askn him if he slept with my wife so them thy affair n MsDebra for knowing n shuting ths drive tru window n walkoff on me being rude n using vulgar language

Of course u kno every is goin to deny evrything so i will send photos of mess sent to mr aj from my wife aswell as a collage my wife erased called da sexual harasmt collage

Now if none of this wer tru y would thy go tru all this trouble to erase it

Thk you for ur time I knour buzy. Sincerely

     Bmartinez

Plz if need b contact me at [number] plzn thk u

I hav contacted Bbb

Eoe n other agencies aswell in order to gt somethn done plz thk u
[sic throughout.]

The marketing and communications team responded, "Thank you for sending this information. I will forward it on to the appropriate management and HR team members. If they have any further questions, they will reach out to you." Martinez sent two replies. In his first reply, Martinez wrote, "Ill sent it evry day till someone responds this man tore my family apart id give evry one drug test n fire half dat staff dey all need a lilt awk about appernce manners ncustomer service! [sic throughout.]" True to his word, Martinez repeatedly copy and pasted his original lengthy complaint again, including on July 15, 2019. In his second reply, he wrote, "Im not goin To b waiting on a response i want something done i will pursue this till the death of me my. Family my wife my kids. Gone My dogs gone. [sic throughout.]" Sonic's internal emails described their "concern" with Martinez arising from this email. Ramirez also testified regarding Martinez's social

media posts about the alleged affair, including four or five posts by Martinez on Ramirez's Facebook photos.

Guzman described Martinez appearing at Sonic multiple times a day, multiple days a week. Guzman also described Martinez's repeated threats and accusations of an alleged affair with Palafos over the phone. After Guzman blocked Martinez's number, Martinez contacted him through Facebook and Twitter before he was blocked there as well. Guzman testified that Martinez's attention began with Palafos, shifted to Guzman, and finally settled on Ramirez.

Officer Clifford Burns testified that he responded to two calls at Ramirez's home—first on July 14, 2019, and later on July 27, 2019. According to Burns's report, Martinez traveled to Ramirez's home and "he stopped in front of their house, got something out of his trunk, and then got back in the car and drove away." Ramirez's doorbell contained a motion-sensor-activated camera that records persons approaching the home. On July 27, 2019, the doorbell recorded Martinez again appearing at Ramirez's house, opening the trunk of his car to retrieve an item, and then returning to his car. Ramirez called the police, and when Martinez showed up to Sonic later that day, he was arrested.

Martinez was indicted for stalking under section 42.072 of the Texas Penal Code, with an enhancement paragraph appended because of prior convictions. Martinez's jury trial commenced on June 7, 2021, and on June 11, 2021, the jury returned a guilty verdict. Appellant pled true to the enhancements, and the court sentenced Martinez to twenty-five years in the Texas Department of Criminal Justice—Institutional Division. This appeal followed.

### STANDARD OF REVIEW

Martinez asserts the evidence is legally insufficient to sustain the verdict. In a sufficiency claim, our role is "restricted to guarding against the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We assess the evidence

in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). The essential elements of the offense are defined by the hypothetically correct jury charge for the case. *Ramos v. State*, 407 S.W.3d 265, 269 (Tex. Crim. App. 2013). Conflicting inferences are resolved in favor of the verdict. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Direct and circumstantial evidence are treated equally, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### ANALYSIS

In two issues, Martinez asserts the evidence is legally insufficient to sustain a guilty verdict. Martinez asserts he was indicted for acts said to have occurred on July 9, July 10, and July 21, 2019. But according to Martinez, the acts alleged *on those dates* do not rise to the level of stalking as part of an ongoing scheme, and a reasonable person would not perceive Martinez's threats as threats of bodily injury.

We begin our review by noting the indictment separately charged allegations "on or about" July 9, July 10, and July 21. *See Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997) ("It is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period."). Although witnesses could not always recall specific dates in relation to specific incidents, the jury could have reasonably believed all of Martinez's actions occurred after his breakup with Palafos—being sometime in May, June, or July 2019. Given the language of the indictment, the jury could have reasonably believed all conduct relating to the charged offence occurred anterior to presentment of the indictment and within the limitations period. *See id.*

Martinez's stalking conviction required the State to prove beyond a reasonable doubt that Martinez, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at Ramirez, intentionally or knowingly threatened to cause bodily injury to Ramirez with the intent to harass, annoy, alarm, abuse, torment, or embarrass Ramirez, which Martinez knew or reasonably believed would cause Ramirez to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and which caused Ramirez to reasonably feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. *See* TEX. PENAL CODE § 42.072.

Viewing the evidence in the light most favorable to the verdict, we hold there is legally sufficient evidence to support the verdict. *See Evans*, 202 S.W.3d at 161. The jury could have reasonably believed, based on the totality of the evidence before them, that Martinez conducted a stalking campaign against Ramirez between his breakup with Palafos in May 2019 and his arrest in July 2019. The jury could have rationally believed Martinez's conduct was intended to terrorize Ramirez, did terrorize Ramirez, and a reasonable person in Ramirez's shoes would also have been terrified.

On July 9, 2019, Martinez visited the Sonic multiple times and exhibited erratic behavior, including cussing at employees, banging on the windows, and attempting to gain entry to the store. At Ramirez's request, Garcia returned to the Sonic after Ramirez felt threatened, whereupon Martinez twice threatened to shoot Garcia before throwing a water bottle at him. *See Hansen v. State*, 224 S.W.3d 325, 328 (Tex. App.—Houston [1st Dist.] 2006 pet. ref'd) (stalking "course of conduct" can include conduct the complainant would regard as threatening bodily injury to a family member). Both 911 calls placed that day and bodycam video corroborated Ramirez's testimony.

On July 10, 2019, Martinez drove by Ramirez and Garcia's home and held out his hand with a white shirt or towel on top of it. The jury could have reasonably believed Ramirez's testimony that she thought Martinez hid a gun under the shirt or towel because by that time, Martinez had threatened to shoot both her and Garcia on multiple occasions. Plus, while Martinez held out his covered hand, he stated, "I'm going to shoot you, I'm going to kill you." Martinez points out that neither Ramirez nor Garcia saw a gun and did not know him to carry or own weapons. According to Martinez, this conduct is insufficient to place a reasonable person in fear or feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. Martinez asserts, "It could just as easily be surmised that Martinez was waving a white flag of surrender." But our standard of review requires us to view the evidence in a light favorable to the verdict. The jury could have determined that a reasonable person, subjected to Martinez's conduct and threats of violence—including those made one day earlier—would be in fear or feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended by Martinez holding out his covered hand as he stated he threatened to shoot and kill her.

With respect to Martinez's conduct on July 21, 2019, Martinez asserts Ramirez's "testimony cannot be believed." The jury saw pictures of Martinez pointing off camera inside Sonic's non-public space; heard from Ramirez that Martinez pointed at her and stated she "better not be effing lying to him" about Palafos; heard testimony from Detective Barbara Thomas that her investigation found credible that Martinez knocked items off the shelves in Sonic's storage area; and that Martinez later drove to Ramirez's home (as previously stated, located on a street with two dead-ends) and cussed her out before speeding off.

Martinez yet again returned to Ramirez's home on July 27, 2021. This time, he was recorded by the doorbell camera. The video shows Ramirez exiting his car, opening his trunk and removing an object, and then returning to his car. Given the totality of the evidence, the jury could

have believed Ramirez's testimony that Martinez went to the Sonic around thirty times and drove by her home twenty to twenty-five times. The jury also considered documentary evidence demonstrating Martinez's erratic behavior, including some of the nineteen emailed complaints to Sonic (one of which we have quoted at length) and his ominous July 15, 2019 reply, "Im not goin To b waiting on a response i want something done i will pursue this till the death of me my. Family my wife my kids. Gone My dogs gone. [sic throughout.]"

Applying the appropriate standard of review, the overwhelming weight of the evidence supports the jury's verdict. We overrule Martinez's issues.

## CONCLUSION

Having overruled Martinez's issues, the judgment of the trial court is affirmed.

Lori I. Valenzuela, Justice

DO NOT PUBLISH